**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLICATION OF PACIFIC INVESTMENT MANAGEMENT COMPANY LLC AND ANCHORAGE CAPITAL GROUP, L.L.C. FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 18 Misc. _____ |


**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION AND PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

I.     FACTUAL BACKGROUND ....................................................................................3

       A.     The Parties ...................................................................................................3

       B.     While Needing Capital and Facing Financial Problems, BPE Remained
              Solvent .........................................................................................................4

       C.     BPE Gears Up For Private Solution to Resolve Financial Problems ....................7

       D.     The May 2017 Disclosures Result In A Catastrophic Liquidity Crisis at
              BPE .............................................................................................................8

       E.     The BPE Resolution Is Rushed Through Based On A Flawed Valuation of
              BPE .............................................................................................................9

       F.     Santander Launches €7 Billion Offering To Facilitate BPE Acquisition .............12

       G.     Petitioners and Other Investors Challenge The Forced Sale of BPE ....................13

              1.     Annulment Actions Before the EUGC ....................................................13

              2.     Spanish Criminal Proceedings ..............................................................14

II.    ARGUMENT .........................................................................................................15

       A.     Legal Framework .......................................................................................15

       B.     Petitioners Satisfy The Statutory Requirements of 28 U.S.C. § 1782. .................16

              1.     Santander Is "Found" In the Southern District of New York. ...................17

              2.     The Discovery Sought is for Use in Foreign Proceedings. ........................23

              3.     Petitioners Are "Interested Persons." .....................................................24

       C.     All of the Discretionary Factors of Section 1782 Weigh In Favor of
              Permitting the Discovery Petitioners Seek. ..................................................25

              1.     The First *Intel* Factor Favors Granting Discovery. ...................................25

              2.     The Second *Intel* Factor Favors Granting Discovery. ..............................26

              3.     The Third *Intel* Factor Favors Granting Discovery. ................................27

              4.     The Fourth *Intel* Factor Favors Granting Discovery. ...............................28

III.   CONCLUSION ......................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017) ...................................................................................... 24

*In re Application for Appointment of a Comm'r re Request for Judicial Assistance for the Issuance of Subpoena Pursuant to*
   *28 U.S.C. 1782*, No. C 11-80136 RS MEJ, 2011 WL 2747302 (N.D. Cal. July 13, 2011) ...... 29

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
   121 F.3d 77 (2d Cir. 1997) .............................................................................. 16, 28

*In re Application of Consellior Sas*,
   No. 16MC00400, 2017 WL 449770 (S.D.N.Y. Feb. 2, 2017) ................................. 24

*In re Application of Imanagement Servs. Ltd.*,
   No. CIV.A. 05-2311(JAG), 2006 WL 547949 (D.N.J. Mar. 3, 2006) .................................... 27

*In re Application of OOO Promnesftstroy*,
   No. M 19-99(RJS), 2009 WL 3335608 (S.D.N.Y. Oct 15, 2009) .......................... 26

*B&M Kingstone, LLC v. Mega Int'l Comm. Bank Co.*,
   131 A.D.3d 259 (1st Dep't 2015) ........................................................................... 18

*In re Bayer AG*,
   146 F.3d 188 (3d Cir. 1998) .............................................................................. 29

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012) ................................................................. 15, 16, 23, 27

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
   798 F.3d 113 (2d Cir. 2015) ................................................................................ 24

*In re Edelman*,
   295 F.3d 171 (2d Cir. 2002) ........................................................................... 16, 24

*Euromepa, S.A. v. R. Esmerian, Inc.*,
   51 F.3d 1095 (2d Cir. 1995) .......................................................................... 16, 26

*In re Ex Parte Application of Alghanim*,
   No. 17 Misc. 406 (S.D.N.Y. Nov. 16, 2017) ......................................................... 17

*In re Ex Parte Application of Kleimar N.V.*,
   220 F. Supp. 3d 517 (S.D.N.Y. 2016) ............................................................. 17, 21

*In re Ex Parte Application of Societe d'Etude de Realisation et d'Exploitation pour le Traitement du Mais*, 2013 WL 6141655 (N.D. Cal. Nov. 21, 2013) ................................... 24

*In re Fuhr*,
   No. 13 Civ. 6753, 2014 WL 11460502 (S.D.N.Y. Aug. 6, 2014) ........................... 17

*In re Godfrey*,
   526 F. Supp. 2d 417 (S.D.N.Y. 2007) .................................................................. 17

*Grupo Mex. SAB de CV v. SAS Asset Recovery, Ltd.*,
   821 F.3d 573 (5th Cir. 2016) ................................................................. 18

*In re Qualcomm Inc.*,
   162 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................. 18

*In re Republic of Ecuador*,
   Nos. C 11-80171, C 11-80172, 2011 WL 4434816 (N.D. Cal. Sep. 23, 2011) ...................... 18

*In re Republic of Kazakhstan for an Order Directing Discovery from Clyde & Co. LLP*
   *Pursuant to 28 U.S.C. sec. 1782*, 110 F. Supp. 3d 512 (S.D.N.Y. 2015) ................................. 17

*In re Servicio Pan Americano de Proteccion*,
   354 F. Supp. 2d 269 (S.D.N.Y. 2004) .................................................... 27

*In re Super Vitaminas, S.A.*,
   No. 17-mc-80125-SVK, 2017 WL 5571037 (N.D. Cal. Nov. 20, 2017) ........................ 17, 23

*In re TPK Touch Sols. (Xiamen) Inc.*,
   No. 16-mc-80193-DMR, 2016 WL 6804600 (N.D. Cal. Nov. 17, 2016) .............................. 18

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004) ............................................... passim

*Matter of Fornaciari for Order to Take Discovery*
   *Pursuant to 28 U.S.C. §1782*, No. 17MC521, 2018 WL 679884 (S.D.N.Y. Jan. 29, 2018) .... 22

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
   2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ......................................... 28

*Pinker v. Roche Holdings Ltd.*,
   292 F. 3d 361 (3d Cir. 2002) .................................................................. 20

*Stoyas v. Toshiba Corp.*,
   191 F. Supp.3d 1080 (C.D. Cal. 2016) ................................................... 20

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
   No. CV 16–02942 SJO(KSX), 2017 WL 2378369 (C.D. Cal. May 17, 2017) ...................... 21

*Vera v. Republic of Cuba*,
   91 F. Supp. 3d 561 (S.D.N.Y. 2015), *rev'd on other grounds*, 867 F.3d 310, 315 (2d Cir.
   2017) ...................................................................................................... 18

## <u>Statutory Authorities</u>

28 U.S.C. § 1782 .................................................................................... passim

Petitioners Pacific Investment Management Company LLC ("PIMCO") and Anchorage Capital Group, L.L.C. ("Anchorage") ("Petitioners"), respectfully submit this Memorandum of Law in support of their Application and Petition pursuant to 28 U.S.C. § 1782 ("Section 1782"), for an order authorizing them to obtain limited discovery from Banco Santander, S.A. and its affiliates Santander Bank N.A., Santander Holdings U.S.A., Inc., and Santander Investment Securities Inc. (collectively "Santander"), in the form of the attached subpoena *duces tecum* and subpoena *ad testificandum* (the "Subpoenas") (the "Application").[1]

## PRELIMINARY STATEMENT

This Application arises from the European institution-ordered resolution and sale of Banco Popular Español, S.A. ("BPE"), then the sixth largest bank in Spain, to Banco Santander S.A., for one Euro, which amounted to a complete expropriation of the Petitioners' investments in BPE's Additional Tier 1 and Tier 2 bonds (the "Bonds"), causing them to suffer over €640 million (or approximately $800 million) in losses (the "BPE Resolution").[2]

The Petitioners have grave concerns about both the BPE Resolution itself and the facts and circumstances that led to it, and have initiated multiple foreign legal proceedings in an attempt to restore their Bonds and annul the BPE Resolution and/or to recover their losses.

First, Anchorage, together with other investors, has commenced separate actions against both the European Single Resolution Board ("SRB") and the European Commission (the "EC") before the General Court of the Court of Justice of the European Union (the "EUGC"), seeking annulment of their decisions giving effect to the BPE Resolution on the basis that they infringed EU law ("EUGC Annulment Actions"). Second, both Petitioners have submitted writs to join, as

---

[1]  The Subpoenas are attached as Exhibit 2 to the Declaration of Peter Calamari, dated April 2, 2018 ("Calamari Decl.").

[2]  The investments were in fact held by a number of discrete investment funds under the management and control of the Petitioners. For ease of reference, this Application refers to the investments as being held by the Petitioners.

"aggrieved parties," ongoing Spanish criminal proceedings commenced in response to complaints by various BPE shareholders and bondholders ("Spanish Criminal Proceedings").  In broad terms, the Spanish Criminal Proceedings involve allegations of various financial crimes by BPE, members of its Board, certain BPE shareholders, and others.

Santander, as a critical participant in and beneficiary of the BPE Resolution that has now acquired possession, custody and control of BPE's books and records, possesses information highly material to the EUGC Annulment Actions and the Spanish Criminal Proceedings. Petitioners bring this Application to obtain discovery in aid of these proceedings.

This Application meets all of the requirements of Section 1782.  Santander "resides or is found" in this district, because (i) of its decades-long systematic and continuous operations in New York, (ii) it transacted business in New York that is directly related to the discovery sought here, including not least a multi-billion dollar rights offering in New York to facilitate its acquisition of BPE, and (iii) it directly enjoyed benefits in the U.S. from the BPE Resolution, in that it resolved certain New York Law-governed securities issued by TotalBank N.A., a U.S.-based subsidiary of BPE.  The discovery sought by the Petitioners, which relates, among other things, to the financial condition and value of BPE both prior to and on the date of the BPE Resolution, the events that led to the forced sale of BPE to Santander, and the existence of private sector measures as alternatives to the BPE Resolution, is relevant to the issues at stake in the EUGC Annulment Actions and the Spanish Criminal Proceedings.  Moreover, each of the discretionary factors laid down by the Supreme Court in the Supreme Court's *Intel* decision favor the discovery sought by Petitioners.  Accordingly, the Petitioners respectfully request that

the Court grant Petitioners' Application and permit Petitioners to serve the Subpoenas on Santander.[3]

## I.    FACTUAL BACKGROUND

### A.    The Parties

**PIMCO.**   Petitioner Pacific Investment Management Company, LLC is an investment and asset management firm formed under the laws of Delaware, with its principal place of business in Newport Beach, California.   PIMCO manages funds that in aggregate held Bonds with a notional value of approximately €489.2 Million (approximately $603 million at current exchange rates).[4]

**Anchorage.**   Petitioner Anchorage Capital Group, L.L.C. is a registered investment adviser under the laws of Delaware, with its principal place of business in New York, New York. Anchorage manages funds that in aggregate held Bonds with a notional value of approximately €154.7 Million (approximately $194 Million at current exchange rates).[5]

**BPE.**   Founded in 1926, Banco Popular Español, S.A. was Spain's sixth largest bank as of June 2017, with €147 billion ($180 billion) in assets.[6]   BPE was listed on the Madrid Stock Exchange until the BPE Resolution on June 7, 2017, and was an active participant in both Spanish and European capital markets, having benefited from billions of Euros in capital investments, including the Bonds purchased by Petitioners.   BPE also had operations in a number

---

[3]    A similar application pursuant to Section 1782 stemming from these same facts was filed with this Court on March 6, 2018.  *See In Re Application Of Antonio Del Valle Ruiz And Others For An Order To Take Discovery For Use In Foreign Proceedings Pursuant To 28 U.S.C. § 1782*, Case No. 18-mc-00085-ER (S.D.N.Y., March, 6, 2018) ("Del Valle Application").  Given the substantial overlap between facts and issues presented in both applications, Petitioners respectfully request that this Application be consolidated with the Del Valle Application.

[4]    Calamari Decl. at ¶ 8.

[5]    Petitioner Anchorage was also exposed to Bonds via derivative instruments.  *See* Calamari Decl. at ¶ 9.

[6]    Calamari Decl. at ¶ 10, Exs. 3 at p. 2, Ex. 4.

of other countries, including ownership of TotalBank, N.A. in the United States.[7]   On June 7, 2017, as a result of the BPE Resolution, BPE was acquired by Santander.[8]

*Santander.*   Banco Santander, S.A. (also known as "Santander Group") is the largest bank in Spain, the largest bank in continental Europe by market value, and one of the largest banks in the world.[9]   It has significant operations in the United States and conducts business both directly and through its wholly-owned US subsidiaries,[10] including Santander Bank, N.A., which maintains at least 18 branches in New York,[11] Santander Holdings U.S.A, and Santander Investment Securities Inc., its investment brokerage arm.   Pursuant to the BPE Resolution, Santander also became the owner of U.S.-based TotalBank N.A., which it later sold to Banco de Crédito e Inversiones for $528 million.[12]

### B.   While Needing Capital and Facing Financial Problems, BPE Remained Solvent

Prior to the BPE Resolution and its acquisition by Santander, BPE was Spain's sixth largest banking group, operating some 1,600 branches.[13]   BPE's business strategy was particularly focused on small and medium-sized enterprises ("SMEs") and BPE had the leading SME franchise in Spain.[14]   This included brand recognition by target clients, a network of good corporate and SME coverage bankers and the delivery of a full suite of products and services aimed at Spanish SMEs.[15]   The events leading up to the BPE Resolution clearly show that, while needing capital and facing some difficult financial problems, its core business remained profitable and in a strong position.

---

[7]   Calamari Decl. at ¶ 10,  Ex. 5.
[8]   Calamari Decl. at ¶ 10,  Ex. 58.
[9]   Calamari Decl. at ¶ 11, Exs. 6, 7, 8.
[10]   Calamari Decl. at ¶ 11, Ex. 8.
[11]   Calamari Decl. at ¶ 11, Ex. 9.
[12]   Calamari Decl. at ¶ 11; Ex. 10.
[13]   Calamari Decl. at ¶ 12, Ex. 3 at p. 2.
[14]   Calamari Decl. at ¶ 12, Ex. 11.
[15]   Calamari Decl. at ¶ 12, Ex. 14 at ¶ 8.

Indeed, in the summer of 2016, BPE passed the European Banking Authority's stress test, designed to test the resilience of major European banks.[16]  BPE's common equity Tier 1 capital stood below the average amongst the big European banks, but above regulatory requirements.[17]  BPE's net asset position up until May 31, 2017 also appeared to be solid, with net assets of €10.78 billion.[18]  Further, BPE at all relevant times kept its liquidity coverage ratio well above regulatory requirements, meaning that the bank possessed highly liquid assets to meet its short-term obligations.[19]  While in April 2017 Standard & Poor's and Moody's downgraded BPE's ratings, importantly neither of these downgrades resulted from concerns about BPE's liquidity.[20]  And first quarter results in 2017 confirmed that BPE's core SME franchise business had remained profitable.[21]

However, BPE's challenges relating to its mortgage-lending business were well-known.  Beginning in the mid-2000s, BPE's retail banking business became increasingly focused on mortgages and other home loans that eventually defaulted during the 2008 financial crisis.  This substantial portfolio of non-performing assets ("NPAs") ultimately began to threaten BPE's capital position, requiring it to seek capital infusions in both November 2012 and May 2016.[22]  BPE also announced a project, dubbed "Project Sunrise," to create a "bad bank" that would absorb its portfolio of NPAs.[23]  The creation of such a "bad bank," in effect a real estate company to which the NPAs would be transferred, had been promoted as a means of

---

[16]   Calamari Decl. at ¶ 13,  Exs. 12, 13.
[17]   Calamari Decl. at ¶ 13, Exs. 12, 13.
[18]   Calamari Decl. at ¶ 13, Ex. 14, at ¶ 10.
[19]   Calamari Decl. at ¶ 13, Ex. 14, at ¶ 11.
[20]   Calamari Decl. at ¶ 14, Ex. 14, at ¶ 11. In fact, Standard & Poor's noted in its report of 11 April 2017 that "[BPE]'s liquidity position has improved over the last few years, with broad liquid assets covering 1.46x its short-term wholesale funding needs at end-2016 … We expect that [BPE]'s funding and liquidity metrics will remain relatively unchanged during 2017."  *See* Calamari Decl. at ¶ 14, Ex. 15, at 10.
[21]   Calamari Decl. at ¶ 15, Ex. 14, at ¶ 12.
[22]   Calamari Decl. at ¶ 16.
[23]   Calamari Decl. at ¶ 16, Ex. 17 at 2.

strengthening BPE's balance sheet.[24]   However, Project Sunrise was later abandoned by BPE's new management, led by Mr. Emilio Saracho,[25] the former Head of Santander's Investment Banking unit.[26]

By early 2017, BPE was clearly under a degree of pressure.  On April 3, 2017, its audit results revealed under-provisioning of bad loan portfolios, as well as unreported loans to clients to buy shares as part of the 2016 capital increase.  Later the same day, its CEO, Mr. Pedro Larena, resigned.[27]  On May 5, 2017, BPE disclosed significant annual losses for 2016 and a first quarterly loss of €137 million.[28]  In light of these facts, questions have been raised about the state of BPE prior to the BPE Resolution and in particular its financial reporting to and transparency with investors, and these are now the subject of the Spanish Criminal Proceedings.  Petitioners have filed a writ to be joined to those proceedings as aggrieved parties, in light of their significant investments in BPE prior to the BPE resolution.[29]

However, while BPE faced challenges and undoubtedly needed additional capital, it appeared to be operating above liquidity requirements and there was no suggestion that it was at *imminent* risk of failure.[30]  Indeed, the SRB's valuation report of June 5, 2017 ("SRB Valuation 1 Report") confirmed there were no indications BPE was insolvent, and no evidence that it infringed capital requirements or that its assets would be less than its liabilities in the near future.[31]

---

[24]   Calamari Decl. at ¶ 16, Ex. 87.
[25]   Calamari Decl. at ¶ 16, Ex. 18.
[26]   Calamari Decl. at ¶ 16, Exs. 18, 19.
[27]   Calamari Decl. at ¶ 17, Ex. 21.
[28]   Calamari Decl. at ¶ 18, Ex. 20.
[29]   Calamari Decl. at ¶ 47; Diaz-Bastien Decl. at ¶¶ 8, 10, Ex. A.
[30]   Calamari Decl. at ¶ 19.
[31]   Calamari Decl. at ¶ 19, Ex. 57.

### C.      BPE Gears Up For Private Solution to Resolve Financial Problems

As a result, BPE had a number of credible private sector options available to it.  Indeed, at BPE's Extraordinary Shareholders' Meeting on April 11, 2017, Saracho sought to define a new strategy for BPE, and explicitly raised the prospect of selling assets, or indeed selling the entire bank to a competitor.[32]  In or around the same time, Saracho hired JPMorgan and Lazard to advise on BPE's options.[33]

In late May 2017, BPE proposed an auction sale of the bank to its competitors, including Santander, Bankia, BBVA, and CaixaBank.[34]  Santander was given access to a data room to conduct due diligence[35] and to prepare a valuation of BPE,[36] and instructed to submit a bid by no later than June 10, 2017.[37]  Santander hired Citigroup to help the bank prepare a "formal bid,"[38] rumored to be around 3 billion euros.[39]  Other competitors were also considering bids in that range, with Bankia reportedly anticipating 4 billion euros for the transaction.[40]

At around the same time, Barclays Bank and Deutsche Bank, with the support of large institutional investors such as Petitioner PIMCO, were also in discussions with BPE about a potential rights issue of up to €4 billion.[41]  Indeed, on June 3, 2017, Barclays sent a letter to BPE stating that it would support a rights issue of up to €4 billion.  It stated that it was "highly confident of [BPE]'s ability to access the equity markets".[42] On June 5, 2017, Deutsche Bank similarly wrote to BPE and stated that it was prepared to underwrite 50% of a possible €4 billion

---

[32]   Calamari Decl. at ¶ 20, Exs. 4, 22.
[33]   Calamari Decl. at ¶ 20, Ex. 23.
[34]   Calamari Decl. at ¶ 21, Exs. 24, 25, 26, 27.
[35]   Calamari Decl. at ¶ 21, Ex. 28.
[36]   Calamari Decl. at ¶ 21, Exs. 29, 30, 31, 32.
[37]   Calamari Decl. at ¶ 21, Ex. 33.
[38]   Calamari Decl. at ¶ 21, Exs. 34., 35.
[39]   Calamari Decl. at ¶ 21, Exs. 36, 37.
[40]   Calamari Decl. at ¶ 21, Exs. 38, 39.
[41]   Calamari Decl. at ¶ 22, Exs. 40, 41.
[42]   Calamari Decl. at ¶ 22, Exs. 40, 41.

capital increase.  It stated that "a capital increase could be performed which would stabilise the bank".[43]  Petitioner Anchorage was also interested in participating in a private placement and had both discussed this with a major investor in BPE and communicated its intentions to BPE directly.[44]

### D.    The May 2017 Disclosures Result In A Catastrophic Liquidity Crisis at BPE

However, while discussions regarding a private sector solution were gathering steam, the European Union's new financial regulator, the SRB, made a series of critical missteps that precipitated a run on the bank and led to a catastrophic liquidity crisis in late May 2017.

First, on 23 May 2017, the Chair of the SRB, Dr. Elke König, confirmed, during an interview with Bloomberg television, and in contravention of professional secrecy obligations imposed by the EU's resolution regulation, that the SRB was "watching" BPE ("23 May Disclosure").[45]  The 23 May Disclosure was heavily reported in the press, particularly in Spain, and led to rumors of an imminent intervention by the SRB.  One press report, released prior to the adoption of the BPE Resolution, described Dr. König's comments as a statement that "kill[s] banks".[46]

Second, the impression given to the market by the 23 May Disclosure was compounded, with catastrophic and immediate effect, by leaked comments from an unidentified EU official in an article published by Reuters on May 31, 2017.  The article quoted the "EU official" as stating that Dr. König had issued an "early warning" regarding BPE, and that the SRB was following the BPE "with a view to intervention" in that BPE "may need to be wound down if it fails to find a

---

[43]   Calamari Decl. at ¶ 22, Exs. 40, 41.
[44]   Calamari Decl. at ¶ 22, Ex. 14, at ¶ 69.
[45]   Calamari Decl. at ¶ 24, Ex. 88.
[46]   Calamari Decl. at ¶ 24, Ex. 43, 44.

buyer" ("the May 31 Leak").[47]   The May 31 Leak, which could have only come from the two EU

institutions involved in the resolution of BPE, namely the SRB and the European Commission,

also entailed a breach of professional secrecy rules under the EU resolution regulation.[48]

Together, these two unlawful disclosures crushed market confidence in BPE.  Significant

volumes of deposits were subsequently withdrawn, with €3 billion in withdrawals on 5 June

2017 alone.[49]  This "formidable run on liquidity"[50] in turn caused BPE's bonds—including those

held the by Petitioners—to trade at distressed levels.[51]

On June 5, 2017, facing an all-out run on the bank, BPE was granted a first tranche of

emergency liquidity assistance from the Bank of Spain.  Of the reportedly €9.5 billion requested,

the Bank of Spain granted €3.8 billion in total, backed by €52.5 billion in assets posted as

collateral.[52]  That aid only lasted two days, and further financial assistance was denied.[53]  Some

analysts have speculated that BPE's failure to obtain additional assistance was partly due to

Saracho's unwillingness to post additional collateral, which was available to BPE.[54]

### E.   The BPE Resolution Is Rushed Through Based On A Flawed Valuation of BPE

On June 3, 2017, at the direction of the SRB, the Fondo de reestructuración ordenada

bancaria ("FROB"), Spain's national banking resolution authority, initiated "Project

Hippocrates," an open tender process to sell BPE to its competitors.[55]  On June 4, the FROB,

through its independent advisers Arcano Asesores Financieros S.L. and Jefferies International

Limited, invited five Spanish banks (Banco Sabadell, CaixaBank, Banco Santander, BBVA and

---

[47]   Calamari Decl. at ¶ 25, Ex. 45.
[48]   *See* Soames Decl. at ¶ 9.
[49]   Calamari Decl. at ¶ 26, Ex. 89, 90.
[50]   Calamari Decl. at ¶ 26, Ex. 14, at ¶ 20.
[51]   Calamari Decl. at ¶ 26, Ex. 47.
[52]   Calamari Decl. at ¶ 27, Exs. 48, 49.
[53]   Calamari Decl. at ¶ 27, Ex. 50.
[54]   Calamari Decl. at ¶ 27, Exs. 36, 37.
[55]   Calamari Decl. at ¶ 28, Exs. 36, 37.

Bankia) to sign confidentiality agreements, providing them access the next day to a virtual data room.[56]

On June 6, the FROB wrote to the banks with suggested bid prices—with some analysts estimating a bid price of 4.9 billion euros and senior executives at BPE discussing anticipated bids of around 3.5 to 4 billion euros[57]—and informed the five banks that bids were due at midnight that *same* day.[58]   However, despite suggesting bid prices, the FROB's letter also stated that the sale price only had to be equal to or greater than €1.[59]   This was in direct contradiction to the EU regulation governing the resolution of European banks (the "Single Resolution Mechanism Regulation," or "SRMR"), which stipulates that the unnecessary destruction of value must be avoided.[60]

Santander was reportedly the only bidder in a position to bid by the deadline.[61]   BBVA, the second largest bank in Spain, withdrew from the tender process because it lacked available data and could not prepare a bid in such a short time.[62]   BBVA wrote to the FROB expressing an interest to re-enter the tender process if the timeline were extended and additional information was provided, but the request was refused by the FROB.[63]   Meanwhile, Santander reportedly had drafted two bids—one for over €3 billion and one for €1—and, after learning it was the only bidder, submitted the latter.[64]

---

[56]   Calamari Decl. at ¶ 29, Exs. 36, 37.
[57]   Calamari Decl. at ¶ 30, Exs. 36, 37.
[58]   Calamari Decl. at ¶ 30, Exs. 36, 37, 51.
[59]   Calamari Decl. at ¶ 30, Ex. 41.
[60]   *See* Soames Dec. at ¶ 12.
[61]   Calamari Decl. at ¶ 31, Exs. 36, 37.
[62]   Calamari Decl. at ¶ 31, Exs. 36, 37, 52.
[63]   Calamari Decl. at ¶ 31, Exs. 36, 37.
[64]   Calamari Decl. at ¶ 31, Exs. 36, 37.

On June 6, 2017, the European Central Bank deemed BPE to be "failing or likely to fail".[65]  In the morning of June 7, 2017, the SRB, purporting to act pursuant to powers conferred by the "SRMR,"[66] adopted the BPE Resolution and ordered the FROB to write down and convert BPE's shares, Additional Tier 1 and Tier 2 bonds, and to transfer the remainder of BPE's business to Santander for the "symbolic price of 1 euro."[67]  Under the terms of the SRMR, the BPE Resolution did not come into effect until the SRB's decision at 05:13 a.m. was reviewed and endorsed by the EC at 06:30 a.m., meaning that the EC had less than 77 minutes to consider and approve the decision before the resolution scheme went into force.[68]

Alarmingly, the SRB's Resolution of BPE was based on a valuation report prepared by Deloitte (the "Deloitte Report") which was described on its face as "highly uncertain and provisional," was produced in just twelve days instead of the six weeks originally envisaged, in the absence of critical information, and on the basis of only limited interaction with BPE's management and auditors.[69]  Deloitte ultimately concluded that the most reliable valuation of BPE would be the best offer made by the potential buyers in the private sector sales process that was already underway, but nevertheless suggested a valuation range of between +€1.3 billion (best case) and -€8.2 billion (worst case), with a "baseline scenario" of -€2 billion.[70]

---

[65]   Calamari Decl. at ¶ 32, Ex. 54 at 8.
[66]   Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010.  *See* Soames Decl. at ¶ 10 & Ex. B.
[67]   Calamari Decl. at ¶ 32, Ex. 53.
[68]   Calamari Decl. at ¶ 33., Ex. 14 at ¶ 25.  In effecting this forced sale, the SRB purported to apply two resolution tools available to it under EU law: the sale of business tool and the write-down and conversion tool.  In combining the two tools, SRB ordered the: (i) write-down of BPE's equity; (ii) the conversion of its Additional Tier 1 bonds to equity and subsequent write-down to zero; (iii) the conversion of Tier 2 bonds to equity and transfer to Santander; and (iv) the disposal of the remainder of BPE's business to Santander.  *See* Calamari Decl. at ¶ 33, Exs. 44, 55.
[69]   Calamari Decl. at ¶ 35, Ex. 56 at 3.
[70]   Calamari Decl. at ¶ 35, Ex. 56 at ¶ 1.1.

11

Strikingly, the negative value of the "baseline scenario" (*i.e.*, -€2 billion) was equivalent to the value of the AT1 and T2 bonds that were ultimately written down under the BPE Resolution, strongly suggesting that the arithmetic in the Deloitte Report was conveniently prepared to fit the pre-determined goal of effecting the sale of BPE for a nominal price.

The SRB also prepared its own valuation of BPE, which concluded there was no indication that BPE was insolvent on the date of the valuation (March 31, 2017).[71]  Specifically, the SRB concluded that while there was a need for coverage and "additional measures to increase … capital," it affirmed that there was "no indication for considering … that [BPE's] assets, in the near future, will be less than its liabilities".[72]  This fact appears to have been swept aside, along with Deloitte's conclusion as to the most reliable basis for valuing BPE, in favor of a valuation that supported the expropriation of Petitioners' Bonds and the acquisition of BPE by Santander for a nominal price.  Santander triumphantly announced the acquisition to the market on June 7, 2017, boasting that the acquisition would result in Santander "becoming the leading bank in Spain" and would generate a return on investment of 13-14% by 2020.[73]

### F.   Santander Launches €7 Billion Offering To Facilitate BPE Acquisition

Santander also announced in connection with the acquisition that it would complete a rights issue for a total amount of €7 billion to cover the capital and provisions required to strengthen BPE's balance sheet.[74]  On July 3, 2017, Santander duly launched a €7 billion capital raise, which included an offering in New York.[75]  Tellingly, the amount of the offering was consistent with the €4 billion Barclays and Deutsche were prepared to raise with the support of large institutional investors such as PIMCO, as part of a recapitalization effort before the BPE

---

[71]   Calamari Decl. at ¶ 36.
[72]   Calamari Decl. at ¶ 36, Ex. 57 at 8.
[73]   Calamari Decl. at ¶ 37, Ex. 58.
[74]   Calamari Decl. at ¶ 38, Ex. 58.
[75]   Calamari Decl. at ¶ 39, Exs. 59, 80, 81.

Resolution, plus an additional amount that Santander sought to raise to build reserves for litigation liabilities.[76]

### G. Petitioners and Other Investors Challenge The Forced Sale of BPE

Faced with overnight losses exceeding half a billion Euros, Petitioners promptly initiated legal actions against the SRB, the EC, BPE and others.

#### 1. Annulment Actions Before the EUGC

On August 17, 2017, Anchorage and other investors filed applications before the EUGC, seeking annulment of the BPE Resolution on the ground that it violated EU law.[77] Under the SRMR, the SRB was authorized to adopt a resolution scheme in respect of BPE only in the event that BPE was "failing or was likely to fail," that there was no reasonable prospect that any alternative private sector measures would prevent its failure within a reasonable timeframe, and that a resolution scheme was necessary in the public interest.[78] In addition, prior to adopting a resolution scheme, the SRB was required to ensure that a "fair, prudent and realistic valuation of the assets and liabilities" of BPE was carried out by an independent person. Further, in adopting a resolution scheme, the SRB was required to uphold the principle that no creditor shall incur greater losses than would have been incurred if an entity had been wound up under normal insolvency proceedings (the "NCWO" principle).

In the EUGC Annulment Actions, Anchorage contends that the adoption and endorsement of the BPE Resolution by the SRB and EC was unlawful in numerous respects, including: (i) that the purportedly independent valuation relied upon by the SRB (i.e., the Deloitte Report) was egregiously flawed; (ii) that the BPE Resolution was excessively disproportionate in that the destruction of over €2 billion in value was not necessary to stabilize

---

[76] Calamari Decl. at ¶¶ 22, 42 & Exs. 83, 85.
[77] Soames Decl. at ¶ 8 & Ex. A.
[78] Soames Decl. at ¶ 10 & Ex. B.

BPE; (iii) that there were numerous private sector measures available that could have restored BPE to viability within a reasonable timeframe; (iv) that the one Euro purchase price was far below BPE's fair market value as of the date of the BPE Resolution; (v) that EC had only 77 minutes to review the SRB's proposed resolution scheme before endorsing it, and that it therefore failed to comply with its legal obligation to assess the discretionary aspects of the resolution scheme; (vi) that the SRB and EC breached their obligations of professional secrecy and confidentiality by improperly disclosing information to the media prior to the BPE Resolution; (vii) that the BPE Resolution breached investors' fundamental rights, including their property rights, under European law; and (viii) the BPE Resolution was adopted and endorsed in violation of investors' right to be heard.[79]

The SRB and EC have filed defenses in the EUGC Proceedings, though Anchorage has yet to receive them.[80]  After it does so, Anchorage will have the right to file a reply and will need the information requested in this Application to substantiate its reply.[81]

## 2.     Spanish Criminal Proceedings

On January 29, 2018, Petitioners filed writs with the Spanish Central Criminal Court ("Spanish Criminal Court") to join as aggrieved parties the Spanish Criminal Proceedings against BPE, members of its management personnel, its directors and others (the "Defendants").[82]  The Defendants are alleged to have breached several articles of the Spanish Criminal Code, including by engaging in false accounting and investment fraud.[83]

---

[79]   Soames Decl. at ¶ 9-12 & Ex. A.
[80]   Soames Decl. at ¶ 15.
[81]   Soames Decl. at ¶ 15.
[82]   Díaz-Bastien Decl. ¶ 8.
[83]   Díaz-Bastien Decl. ¶ 10 & Ex. A.

The first phase of the Spanish Criminal Proceeding involves an extensive criminal investigation carried out under the supervision of the Spanish Criminal Court.[84]  As aggrieved parties, Petitioners will be entitled to submit evidence to the Court during the investigation phase, and they will be entitled to receive copies of any evidence filed.[85]  Aggrieved parties are also entitled to receive damages for any harm they can prove they suffered as a result of any offences committed if and when the Spanish Criminal Court decides to prosecute at the end of the investigation phase and, after the oral hearing, a conviction Judgment is issued.[86]

## II.   ARGUMENT

### A.   Legal Framework

 Section 1782 of Title 28 of the United States Code ("Section 1782") permits United States District Courts to grant discovery for use in a foreign proceeding.  The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person.
> 28 U.S.C. § 1782.

An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

---

[84]   Díaz-Bastien Decl. ¶ 10.
[85]   Díaz-Bastien Decl. ¶ 11.
[86]   Díaz-Bastien Decl. ¶ 11.

After determining that the three statutory requirements are satisfied, courts must then consider four discretionary factors in deciding whether to grant a Section 1782 application: (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004).

Moreover, courts in this circuit "evaluate discovery requests under section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Euromepa S.A. v. R. Esmerian*, Inc., 51 F.3d 1095, 1097 (2d Cir. 1995); *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997). Both the Supreme Court and this Court have acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

## B.  Petitioners Satisfy The Statutory Requirements of 28 U.S.C. § 1782.

Petitioners satisfy the three statutory requirements of section 1782: (1) Santander is "found" in the Southern District of New York; (2) the requested information is for use in the

EUGC Annulment Actions and the Spanish Criminal Court; and (3) Petitioners are "interested persons" as participants in those foreign proceedings.

### 1. Santander Is "Found" In the Southern District of New York.

While the Second Circuit has not yet provided a definitive construction of the term "found" under Section 1782 as applied to corporate entities, courts in this district have typically held that an entity is "found" in this district if it has a "systematic and continuous" presence in the Southern District of New York. *See In re Republic of Kazakhstan for an Order Directing Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. sec. 1782*, 110 F. Supp. 3d 512, 515 (S.D.N.Y. 2015) ("Clyde & Co. LLP's partners' daily practice of law in this jurisdiction gives it the requisite 'systematic and continuous' presence to be 'found' here for purposes of section 1782."); *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016) (defendant that conducted "systematic and regular business" in New York was "found" in this district).[87]

Santander has clearly engaged in the sort of systematic and continuous activities that courts have considered sufficient to allow a foreign corporation to be "found" in a district for purposes of Section 1782; which is presumably why this Court recently authorized discovery of Santander in another Section 1782 proceeding, an order that Santander did not challenge. *In re Ex Parte Application of Alghanim*, No. 17 Misc. 406, Doc. 7 (S.D.N.Y. Nov. 16, 2017) (granting application for section 1782 discovery of books and records held at Santander, N.A's New York branch at 45 East 53rd Street).[88]

---

[87] *Compare In re Fuhr*, No. 13 Civ. 6753, 2014 WL 11460502, at *2 (S.D.N.Y. Aug. 6, 2014) (corporation was not "found" in the district because it "has no offices or property here" and "does no business here"); *In re Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007) (corporations not "found" in the Southern District where there was "no allegation" that they had "engaged in systematic and continuous activities in this district").

[88] Courts in other circuits take the same approach. *See, e.g.*, *Grupo Mex. SAB de CV v. SAS Asset Recovery, Ltd.*, 821 F.3d 573, 575-77 (5th Cir. 2016) (Cayman Islands company "indisputably 'resides or is found in' the district" based on fact that it had office space and personnel there); *In re Super Vitaminas, S.A.*, No. 17-mc-

17

***Significant Business Activities in this District.***   Santander has a longstanding and significant presence in this district.  Indeed, for over 40 years, Banco Santander S.A. has engaged in "U.S. banking activities directly through [its] New York branch,"[89] which is supervised by the New York State Department of Financial Services, and managed $25.2 billion in assets as of 2015.[90]  Santander's New York branch is a hub from which Santander has extended billions of dollars in intragroup loans to Santander subsidiaries both in the U.S. and across Latin America.[91]  This is unsurprising given that Santander's US operations are, by its own admission, "focused," inter alia, on "maximizing the interconnectivity offered by being part of a global group."[92]  Santander has also used its New York branch to enter into various financial agreements in the United States, including Pledge and Loan Agreements with third parties.[93]   Further, Banco Santander, S.A. has certified and listed its New York branch as "Process Agent" in its 2017 Patriot Act Certification.[94]   In the same document, Banco Santander, S.A. certified that its New York branch is a "resident of the United States [in New York]" and "is authorized to accept

---

80125-SVK, 2017 WL 5571037, at *2 (N.D. Cal. Nov. 20, 2017) (corporation "found" in district "because it maintains two offices in this [d]istrict"); *In re TPK Touch Sols. (Xiamen) Inc.*, No. 16-mc-80193-DMR, 2016 WL 6804600, at *2 (N.D. Cal. Nov. 17, 2016) (corporation "maintains an office in this district and is 'found' here for purposes of Section 1782"); *In re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1036 (N.D. Cal. 2016) ("Through these in-district offices, [the corporations] conduct systematic and continuous local activities and thus may be found within the Northern District for the purposes of Section 1782.") (internal quotation marks omitted); *In re Republic of Ecuador*, Nos. C 11-80171, C 11-80172, 2011 WL 4434816, at *2 (N.D. Cal. Sep. 23, 2011) (corporation "found" in district because it "maintains an office … in this district").

[89]   Calamari Decl. at ¶ 50, Ex. 46, at 92.

[90]   Calamari Decl. at ¶ 50, Ex. 60 at 2 & Ex. 91 at 3 (noting that Santander's New York Branch has $14.8 billion in assets regulated by the New York State Department of Financial Services).  Numerous courts have also held that a bank's registration under regulatory regimes such registration under the New York State Department of Financial Services constitutes consent to personal jurisdiction in proceedings for the enforcement of an informational subpoena, such as the Section 1782 proceeding here. *See e.g.  See, e.g.*, *B&M Kingstone, LLC v. Mega Int'l Comm. Bank Co.*, 131 A.D.3d 259, 265 (1st Dep't 2015); *Vera v. Republic of Cuba*, 91 F. Supp. 3d 561 (S.D.N.Y. 2015), *rev'd on other grounds*, 867 F.3d 310, 315 (2d Cir. 2017).

[91]   Calamari Decl. at ¶ 51, Ex. 61, at 141 & Ex. 91 at 9 (noting that Santander New York Branch extended a $1.4 billion loan to Santander Consumer USA, Inc.).

[92]   Calamari Decl. at ¶ 51, Ex. 46, at 46.

[93]   Calamari Decl. at ¶ 51, Ex. 62. ("WHEREAS, DDFS … and Banco Santander, acting through its New York Branch, are party to that certain Second Amended and Restated Pledge Agreement executed as of February 26, 2014.").

[94]   Calamari Decl. at ¶ 52, Ex. 63 at 4.

service of legal process on [its] behalf…from the Secretary of the Treasury or the Attorney General of the United States…".[95]

Santander Bank, N.A. operates at least 18 branches in New York, including the branch at 45 East 53rd Street that it shares with Banco Santander, S.A, and another steps away from this Courthouse at 336 Broadway.  Santander Bank, N.A.'s Global Banking & Markets unit is "based out of Boston and New York," providing "services in the U.S. to global clients" and booking "the revenue from these services locally[, including New York]."[96]  Santander Bank, N.A. is also active in the New York community, having launched numerous community projects with colleges in New York City.[97]

While Santander Holdings U.S.A., Inc. lists Boston as its headquarters, in a separate action brought in this Court, Santander Holdings USA, Inc. admitted that it "maintain[s] offices and conduct[s] business in this district."[98]  Further, its CEO, Scott Powell, lists his location on LinkedIn as New York City and is a board member for at least two New York based non-profits.[99]  The Chairman of the Board of Santander Holdings USA, Inc., Thomas Ryan, Jr., is also based in New York.[100]  This suggests that a significant portion of Santander Holdings USA, Inc.'s executive functions occur in this District.

Santander's US investment brokerage arm, Santander Investment Securities Inc., also maintains its "principal executive office" at 45 East 53rd Street, New York.  Upon information

---

[95]   Calamari Decl. at ¶ 52, Ex. 63 at 4.
[96]   Calamari Decl. at ¶ 53, Ex. 60 at 10.
[97]   *See e.g.* Calamari Decl. at ¶ 53, Ex. 64. (showing that in 2015, Santander Bank, N.A. formalized a collaboration agreement with City College of New York to increase access to continuing education programs, enhance international outreach initiatives and support cultural offerings in New York City).
[98]   *Romano v. Santander Holdings USA, Inc., et al.*, case 1:15-cv-07387-CM (S.D.N.Y.), ECF No. 15 ¶ 9.
[99]   Calamari Decl. at ¶ 54, Exs. 65, 66.
[100]  Calamari Decl. at ¶ 54, Exs. 67, 68.

and belief, Santander Investment Securities Inc. has marketed investment materials related to BPE and possesses information about BPE's acquisition, including valuations of BPE.[101]

***Significant Investment Activities in this District.*** Santander has made New York its investments and capital raising nerve-center.[102]   For example, Banco Santander, S.A. has sponsored American Depositary Receipts ("ADRs") on the New York Stock Exchange ("NYSE"),[103] and thereby affirmatively entered the United States' securities market.  *See Pinker v. Roche Holdings Ltd.*, 292 F. 3d 361, 367 (3d Cir. 2002) (foreign company subject to U.S. jurisdiction "when it has taken affirmative steps to market its ADRs to the American investing public").[104]

Banco Santander, S.A.'s ADRs, which have been trading on the NYSE "for more time than any other Spanish company,"[105] have helped it raise billions of dollars by trading on the NYSE.   Indeed, on June 1, 2017, just days before the BPE Resolution was adopted, Banco Santander, S.A. celebrated 30 years of trading ADRs on the exchange.[106]   In October 2017, Santander held its group Global Strategy Update meeting, where its Executive Chair, C.E.O., and

---

[101]   Calamari Decl. at ¶ 55, Ex. 69 (NYS Department of State corporate registry showing Santander Investment Securities Inc's Principal Executive Office in New York City), Ex.70 ("As the intermediate holding company for Santander's U.S. businesses, SHUSA includes six financial companies with more than 17,500 employees, 5.2 million customers and assets of over \$135.1 billion…[These include…] *Santander Investment Securities Inc. of New York.*) (emphasis added), & Ex. 70.

[102]   Calamari Decl. at ¶ 56, Ex. 72 at 1 ("The U.S. is a key strategic market for Banco Santander in terms of our investor relations efforts," said José García Cantera, Banco Santander's chief financial officer.").

[103]   Calamari Decl. at ¶ 56, Ex. 92.

[104]   *See also Vancouver Alumni Asset Holdings Inc. v. Daimler AG,* No. CV 16–02942 SJO (KSX), 2017 WL 2378369, at *8 (C.D. Cal. May 17, 2017) (foreign corporation that sponsors ADR program in the U.S. subject to jurisdiction on claims by U.S. purchasers of the ADRs). *Cf. Stoyas v. Toshiba Corp.,* 191 F. Supp.3d 1080, 1091 (C.D. Cal. 2016) (unsponsored ADRs do not support jurisdiction because company is not a willing participant).

[105]   Calamari Decl. at ¶ 56, Ex. 73.

[106]   Calamari Decl. at ¶ 56, Ex. 73.

other senior executive presented to investors and analysts in New York.[107]  Santander has also

co-organized trade missions in New York City for its global clients.[108]

Such investment activities are an additional ground for this Court to find that Santander is

"found" in this District.  In *In re Ex Parte Application of Kleimar N.V.*, this Court held that a

Section 1782 respondent was "found" in this District because it had "significant contacts with

New York," including trading ADRs on the NYSE, filing regular returns with the SEC, listing a

New York-based subsidiary as process agent, and conducting systematic and regular business in

New York.  *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y.

2016).  All of the same facts are present here:  Santander trades ADRs on the NYSE; has made

regular filings with the SEC, including a 2017 filing listing its New York branch as agent for

service in the United States;[109] and conducts systematic and regular business in New York.[110]

*Activities in this District Related to Requested Discovery.*  In addition to its longstanding

presence in the district, Santander has engaged in activities in New York that directly relate to

the subject-matter of the discovery Petitioners seek.  *Matter of Fornaciari for Order to Take*

*Discovery Pursuant to 28 U.S.C. §1782*, No. 17MC521, 2018 WL 679884, at *2 (S.D.N.Y. Jan.

29, 2018) (noting that, for purposes of Section 1782 discovery, affiliations with New York must

be "so continuous and systematic as to render it essentially at home in [New York], *or that it*

*have sufficient contacts with [New York] that relate to the requested discovery or from which the*

*discovery order arises*." (emphasis added)).

---

[107]  Calamari Decl. at ¶ 57, Exs. 74, 75, 76.

[108]  Calamari Decl. at ¶ 58, Ex. 77  ("For the second year, UK Trade & Investment (UKTI) hosted a delegation of Santander UK's business clients who are exploring the US market.").

[109]  Calamari Decl. at ¶ 59, Ex. 78.

[110]  Santander has also directly enjoyed benefits in this District by its indirect acquisition of TotalBank N.A. pursuant to the BPE Resolution.  The BPE Resolution also expropriated the New York law-governed TotalBank bonds.  Calamari Decl. at ¶ 11, Ex. 42.

On June 7, 2017, Santander announced that it would complete a €7 billion rights issue to cover the capital and provisions required to strengthen BPE's balance sheet.[111]  This offering was, by Santander's own admission, directly related to the BPE acquisition.  Indeed, Santander's Prospectus Supplement for the offering stated that:

> "At the time Banco Santander announced its intention to acquire Banco Popular, Banco Santander simultaneously announced its intention to effect a capital increase for approximately €7 billion to reinforce and optimize the Bank's equity structure to adequately cover the addition of Banco Popular following the Acquisition.
>
> […]
>
> USE OF PROCEEDS.  The purpose of the Capital Increase is to reinforce and optimize the Bank's equity structure to adequately cover the addition of BPE following the Acquisition. We intend to use the net proceeds from the Offer for general corporate purposes in connection with the Acquisition."[112]

Within days of the BPE Resolution and the acquisition, Santander's leadership embarked on "roadshow" meetings with analysts and investors in New York to raise capital that it needed in order to facilitate the acquisition of BPE and help the merged entity meet regulatory capital thresholds.[113]  Pursuant to Prospectus for the offering, Santander submitted to the jurisdiction of New York and U.S. federal courts sitting in New York City "for the purpose of *any suit, action, or proceeding arising out of or in connection with the securities* and have appointed Banco Santander, S.A., New York Branch, as agent in New York City to accept service of process in any such action."[114]

---

[111]  Calamari Decl. at ¶ 38, Ex. 58.

[112]  Calamari Decl. at ¶ 40, Ex. 79, at S-25, S-31.

[113]  Calamari Decl. at ¶ 39, Exs. 80, 81, at 6 ("José García Cantera, financial director of Group Santander and President of the transition Board of Banco Popular, and his team have been presenting the operation to qualified investors in London, Brussels, Abu Dabi, Kuwait, New York, Singapore, and Switzerland, among other big cities and reference countries. Tomorrow they will be in Dublin and in Munich on Wednesday. According to the plan and calendar, that will be the last city in the programmed road show of the entity.").

[114]  Calamari Decl. at ¶ 41, Ex. 82, at 15 (emphasis added).

In short, Santander has had a significant, continuous presence in New York for over four decades, and has conducted activities here that relate directly to the discovery Petitioners now seek.  Santander thus "resides or is found" in this District.

**2.    The Discovery Sought is for Use in Foreign Proceedings.**

The EUGC Annulment Actions and the Spanish Criminal Proceedings qualify as proceedings "in a foreign or international tribunal" for purposes of Section 1782.  First, the Supreme Court has specifically held that European Court of Justice is a tribunal that qualifies under Section 1782.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 257, 124 S. Ct. 2466, 2479, 159 L. Ed. 2d 355 (2004) ("[B]oth the Court of First Instance and the European Court of Justice, qualify as tribunals.").[115]  Second, the statute itself explicitly covers "criminal investigations," and cases routinely find that criminal proceedings qualify under Section 1782. 28 U.S.C. § 1782 (district court may order discovery "for use in a proceeding in a foreign or international tribunal, *including criminal investigations conducted before formal accusation*." (emphasis added)); *In re Application of Consellior Sas*, No. 16MC00400, 2017 WL 449770, at *1 (S.D.N.Y. Feb. 2, 2017) (granting Section 1782 discovery in connection with petitioner's participation in foreign criminal proceeding); *Super Vitaminas, S. A.*, No. 17-MC-80125-SVK, 2017 WL 5571037, at *1 (N.D. Cal. Nov. 20, 2017) (same); *In re Edelman*, 295 F.3d 171, 180 (2d Cir. 2002) (noting that Section 1782 was amended in 1996 to clarify that Section 1782(a) could be used to provide discovery for use in criminal proceedings abroad).

Petitioners are not required to show that the information sought would be discoverable or admissible in the foreign proceedings.  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("[A]s a district court should not consider the *discoverability* of the

---

[115] *See also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004) (Section 1782 affords "assistance in cases before the European Court of Justice") (internal citations omitted).

evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application.").  Rather, Petitioners only need to show that they have "the *practical ability* . . . to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017).

Here, Petitioners plainly satisfy this requirement.  The information sought in the Subpoenas is highly material to the EUGC Annulment Actions and the Spanish Criminal Proceedings because it relates to the events that led to BPE's Resolution and the forced sale to Santander, the existence of viable alternative options to the BPE Resolution, the valuation and financial condition of BPE, and the fairness of the one Euro purchase price paid by Santander— the very issues at stake in the EUGC Annulment Actions and the Spanish Criminal Proceedings (see *supra* at G).

### 3.    Petitioners Are "Interested Persons."

Finally, section 1782 requires persons seeking discovery to show that they possess a reasonable interest in the foreign proceedings.  While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s] who may invoke § 1782." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004).  Petitioners are parties to the pending EUGC Annulment Actions and have filed writs to join as "aggrieved parties" in the Spanish Criminal Proceedings.  Petitioners are thus plainly "interested person[s]" under Section 1782.  *See also In re Ex Parte Application of Societe d'Etude de Realisation et d'Exploitation pour le Traitement du Mais*, 2013 WL 6141655, at *1 (N.D. Cal. Nov. 21, 2013) ("As the alleged victim, [the applicant] is an "interested person.").

24

### C.    All of the Discretionary Factors of Section 1782 Weigh In Favor of Permitting the Discovery Petitioners Seek.

Once the threshold requirements under section 1782 are met, the Court considers the four discretionary "*Intel* factors."  *See supra* at 21.  Each of these factors weighs in favor of granting the requested discovery here.  *First*, Santander is not a party to either the EUGC Annulment Actions or the Spanish Criminal Proceedings.  *Second*, there is no reason to believe that either the EUGC or the Spanish Criminal Court would be unreceptive to evidence obtained through Section 1782 discovery, and indeed both cases are fact-intensive proceedings to which the discovery sought is directly relevant.  *Third*, Petitioners are acting in good faith and are not seeking to avoid any foreign restriction on gathering evidence.  *Fourth*, the requests are carefully circumscribed and targeted to key questions in the foreign proceedings so as to avoid undue burden on Santander.

### 1.    The First *Intel* Factor Favors Granting Discovery.

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding.  "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding  . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."  *Intel*, 542 U.S. at 264.

Here, Santander is not a party to the foreign proceedings.  The EUGC Annulment Actions seek to invalidate the SRB's Resolution Decision; as such, only the EC and SRB can be proper respondents.  The Spanish Criminal Proceedings seek to investigate criminal allegations into BPE, its management, and others.[116]

---

[116]   On February 14, 2018, as part of the investigation phase in the Spanish Criminal Proceedings, the Spanish Criminal Court ordered Banco Santander, S.A. to produce two categories of documents, namely: (i) "[r]eports on the acquisition of BPE" (specifically, "[r]eports supporting the valuation (including the one submitted to the

## 2.   The Second *Intel* Factor Favors Granting Discovery.

Under the second *Intel* factor, this Court looks to whether the foreign tribunal would be receptive to evidence obtained through section 1782.  *See In re Application of OOO Promnesfstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing second factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782").  There is a strong presumption that the foreign tribunal will be receptive to evidence obtained in the United States, with the Second Circuit holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance."  *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995).  A court should deny discovery on the basis of lack of receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782."  *Id.* at 1100 (emphasis added).

Both the EUGC and the Spanish Criminal Court will be receptive to evidence obtained as a result of this Application.[117]  In the EUGC Annulment Actions, Petitioners will have the opportunity to present documents after the respondents have submitted their defense.[118]  In the Spanish Criminal Proceedings, Petitioners will be able to present their evidence at any point before the beginning of the oral hearing.[119]

---

Board supporting the offer, and those that were done following the acquisition") and (ii) "[a]nalysis of previous offers by Banco Santander [, S.A.] to purchase [BPE], and any offers made during the 2016 and 2017 fiscal years".  However, it is not clear whether or when documents will actually be produced pursuant to the Criminal Court's order, or how expansively Santander will construe the categories of documents they have been ordered to produce.  In any event, the Subpoenas seek numerous categories of documents that are outside the scope of the Criminal Court's order.  *See* Calamari Decl. at ¶ 49.

[117]   Díaz-Bastien Decl. at ¶ 15; Soames Decl. at ¶ 16.
[118]   Soames Decl. at ¶ 15.
[119]   Díaz-Bastien Decl. at ¶ 14.

Further, courts have determined that the receptivity of a foreign court to U.S. federal judicial assistance may be inferred from the existence of treaties that facilitate cooperation between the U.S. federal judiciary and the foreign jurisdiction. *See In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) (foreign jurisdiction has "has indicated its receptivity to federal judicial assistance by its signature of treaties facilitating such cooperation"); *In re Application of Imanagement Serv*s. Ltd., No. CIV.A. 05-2311(JAG), 2006 WL 547949, at *4 (D.N.J. Mar. 3, 2006) (same). Both the European Union and Spain have entered into such treaties with the United States.[120]

### 3.  The Third *Intel* Factor Favors Granting Discovery.

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. The *Intel* Court expressly rejected the notion that section 1782 requires that the evidence be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad. *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("While *Intel* concerned the discoverability of evidence in the foreign proceeding, we see no reason why it should not extend to the admissibility of evidence in the foreign proceeding. As in *Intel*, there is no statutory basis for any admissibility requirement."); *see Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."). Nor is there any requirement to exhaust one's remedies in the

---

[120] *See* Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (also known as the Hague Evidence Convention) (United States and Spain have both signed and ratified the convention); U.S.- Spain Treaty on Mutual Legal Assistance in Criminal Matters, entered into force June 30, 1993. Senate Treaty Doc. 102-21, 102nd Cong. 2d. Ratified October 9, 1992; Agreement On Mutual Legal Assistance Between The United States of America and the European Union, entered into force February 1, 2010. Senate Treaty Doc. 110-13, 110th Cong. 2d. Ratified December 11, 2008.

foreign court first.  *See In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-exhaustion requirement,' finds no support in the plain language of the statute and runs counter to its express purposes.").

Here, there is no reason to believe that any of the discovery sought violates public policy. Petitioners do not seek customer account information, state secrets, or attorney-client communications—they merely seek documents and communications that are in the possession of private parties regarding a major transaction that expropriated their investments.  Neither the European Union nor the Spanish discovery rules have any law or public policy against such discovery.[121]  *See In re Application for Appointment of a Comm'r re Request for Judicial Assistance for the Issuance of Subpoena Pursuant to 28 U.S.C. 1782*, No. C 11-80136 RS MEJ, 2011 WL 2747302, at *5 (N.D. Cal. July 13, 2011) (granting section 1782 discovery in aid of Spanish court proceedings).  Moreover, if Santander reasonably believes that any individual documents present such concerns, Petitioners are willing to consider accommodating such concerns, such as by stipulating to a protective order.  *See, e.g. Minatec Fin. S.A.R.L. v. SI Group Inc.*, 2008 WL 3884374, at *1 (N.D.N.Y. Aug. 18, 2008) ("[T]he beauty of § 1782 is that it permits this Court to impose a protective order that would extinguish any concern that privileged, confidential, or proprietary information would be indecorously revealed.").

### 4.    The Fourth *Intel* Factor Favors Granting Discovery.

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 265.  The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure.  "The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under

---

[121]    Soames Decl. at ¶ 16; Díaz-Bastien Decl. at ¶ 15 & Exs. C-D.

those rules should also apply when discovery is sought under the statute." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998) (involving a 1782 application related to Spanish court proceedings).

Here, the requests are narrowly tailored, temporally limited, and directly relevant to questions in the foreign proceedings. To the extent that the documents sought are voluminous, these documents are readily available to Santander and have been utilized by Santander to facilitate its acquisition of BPE and ensuing integration, as well as to market investment products related to the acquisition. Whatever burden respondents may incur by producing the requested discovery, it is both modest and proportionate given the circumstances.

## III.   CONCLUSION

Santander possesses material information regarding the forced sale of BPE that is of critical importance to the foreign proceedings in Europe. For the foregoing reasons, Petitioners respectfully request that the Court (a) grant the *Ex Parte* Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed Order attached to the Calamari Declaration as Exhibit 1, (c) authorize Petitioners, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas; and (d) grant any and all other relief to Petitioners as deemed just and proper.

Dated:  New York, NY
        April 3, 2018

Respectfully submitted,

/s/ Peter Calamari

Peter Calamari
Lucas V.M. Bento
petercalamari@quinnemanuel.com
lucasbento@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
51 MADISON AVENUE, FLOOR 22
NEW YORK, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Paul B. Hughes
paulhughes@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN
UK LLP
90 High Holborn
London WC1V 6LJ
United Kingdom
Telephone: +44 (0) 20 7653 2000
Facsimile: +44 (0) 20 7653 2100

*Attorneys for Petitioners*